# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| UNITED STATES OF AMERICA | |
| v. | Criminal No. 20-79 |
| JUSTIN JULIETTE | |

### RESPONSE TO DEFENDANT'S MOTION TO SUPPRESS EVIDENCE

AND NOW comes the United States of America, through its counsel, Scott W. Brady, United States Attorney for the Western District of Pennsylvania, and Brian M. Czarnecki, Assistant United States Attorney for said district, and respectfully submits its Response to Defendant's Motion to Suppress Evidence and Statements, ECF No. 27.

Justin Juliette unlawfully imported dozens of Glock autoswitch devices from China. The devices serve one purpose: to convert semi-automatic pistols into fully automatic machineguns. In March 2019, pursuant to a search warrant, federal agents seized dozens of these devices from Juliette's home, which he used to sell firearms under a Federal Firearms License (FFL). Agents also discovered and seized steroids that Juliette had been using illegally for around a decade.

As some agents searched, others interviewed Juliette in a room at the back of the house. During the interview, Juliette admitted to importing the autoswitch devices and using steroids. He also admitted to possessing other firearms in violation of the National Firearms Act (NFA).

Juliette now moves to suppress his statements. In his motion, Juliette argues that the Fifth Amendment requires suppression because he was subjected to a custodial interrogation without being Mirandized. ECF No. 27, at 9. Juliette also moves to suppress some physical evidence seized during the search, arguing it was obtained based on his unwarned statements. *Id.*

Although agents did not Mirandize Juliette, his arguments are without merit. To begin, a key claim repeated throughout Juliette's motion—that he "was handcuffed during most or all of the recorded interrogation," *id.* at 6—is false. Agents removed Juliette's handcuffs after placing him in the room for the interview. This fact is corroborated at numerous points in an audio recording of the interview, including when Juliette took a phone call from his boss and when he opened phone applications to show agents how he ordered the autoswitches and steroids.

The audio recording also seriously undermines the Defendant's claim he was interviewed under duress. Agents explained to Juliette that he was not under arrest and that he was free to leave, and agents remained cordial throughout the interview. Agents offered Juliette the opportunity to call or text his mother and girlfriend. Juliette was at ease with the agents and joked about sending his girlfriend a selfie. Toward the end of the hour-long interview, the agents and Juliette chatted about his day job and other things. Rather than return to that day job, Juliette opted to stay home, and an agent offered to sit with Juliette and continue to chat while the other agents finished searching. Juliette declined, quipping that he did not want to "bore" the agent.[1]

In short, the interrogation was noncustodial, and *Miranda* was not implicated. As a result, neither Juliette's statements nor any physical evidence should be suppressed. In fact, no physical evidence should be suppressed regardless of whether there was a *Miranda* violation. The "fruit of the poisonous tree" doctrine does not apply to *Miranda* violations, and, in any event, agents obtained the evidence independently, pursuant to a valid search warrant.

---

[1] Curiously, neither the exchange about the selfie, nor the light-hearted interaction at the end of the interview appear in the transcript the Defendant filed as Exhibit B to his motion.

I.  **BACKGROUND**

Justin Juliette sold firearms from his home in Punxsutawney, Pennsylvania. Juliette had a Type 01 FFL authorizing him to deal firearms, and he was also a valid Class III Special Occupational Taxpayer, which enabled him to sell NFA weapons, including machineguns. From 2010 to 2016, Juliette held a separate FFL that authorized him to manufacture firearms.

In March 2019, Juliette ordered a parcel from China addressed to his home. The parcel's customs declaration described its contents as "screwdriv" and listed the quantity as six. When the parcel arrived at the Los Angeles International Mail Facility, a customs officer lawfully examined it and discovered six devices identified as Glock autoswitches. The sole purpose of an autoswitch is to convert a semi-automatic Glock pistol into a fully automatic machinegun. These devices, alone, are classified as machineguns, and they are illegal to import from China.[2]

Law enforcement determined that Juliette had received around 34 parcels from China over three years preceding the discovery of the autoswitches. Agents suspected that some of these parcels contained autoswitches based on their customs declarations. As a result, a Homeland Security Investigations (HSI) Special Agent applied for a warrant to search Juliette's home. United States Magistrate Judge Lisa Pupo Lenihan signed the warrant.

On March 19, 2019, law enforcement executed the search. Based on the numerous packages received from China, Juliette's prior license to manufacture machineguns, and the fact that he sold firearms from his home, law enforcement approached the search cautiously. To mitigate risk, agents waited for Juliette to go to work at the Genesee-Wyoming railroad company,

---

[2] Under the National Firearms Act, a machinegun includes "any part designed and intended solely and exclusively . . . for use in converting a weapon into a machine gun." 26 U.S.C. § 5845(b).

a short distance from his home. Agents arrived at approximately 11:30 am. Juliette arrived around 12:10 pm in a truck owned by his employer, expecting to meet a customer based on an earlier pretextual call from an agent. With firearms drawn, agents immediately ordered Juliette to the ground and handcuffed him.

Juliette remained handcuffed initially. Juliette was asked for the key to his home, and he provided an entry code for the front door. Agents then entered the home and began clearing it to ensure it was safe to search. Once agents determined the residence was safe, they began executing the search. In total, approximately 20 agents were present.

While most agents searched, Special Agent William Isbir from the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) and Special Agent Michael Pausic from HSI interviewed Juliette in a room in the rear. The interview began approximately 25 minutes after Juliette returned home. Agents Isbir and Pausic walked with Juliette to the room, ensured that it was safe, and then removed Juliette's handcuffs. The handcuffs remained off during the interview and the remainder of the day. Agent Isbir recorded the audio of the interview, but, because he pressed the wrong button at first, the recording begins moments after the agents introduced themselves. The audio recording will be provided to the Court as Exhibit A, and a transcript is attached as Exhibit B.[3]

At the beginning of the recording, Agent Isbir told Juliette that he was "not under arrest" and that he was "free to leave." Ex. B, Transcript of Mar. 19, 2019 Interview ("Tr."), at 2. Juliette

---

[3] The Defendant attached a transcript of the interview to his motion. Ex. B, ECF No. 27-2. Upon comparing the exhibit with the audio recording, the Government noted several errors and omissions in the transcript, possibly because the interview was fast-paced or the interviewers and Juliette talked over each other. Regardless, because some errors and omissions are material both to claims in the Defendant's motion and to the Government's case-in-chief, the Government requested Conduit Transcriptions prepare a transcript, which is attached as Exhibit B.

responded, "I'm not leaving. … I'll just stay here– … [w]ith you guys. I don't have to be at work. I can like, claim it as like, I'm kinda hiding. I guess for the day…" *Id.* During the interview, Isbir twice reminded Juliette that he was not under arrest. *Id.* at 8 ("[S]o you—so again, not under arrest or anything."); *Id.* at 53 ("[S]o you're—like I said, not arrested.").[4]

Agents remained respectful and cordial throughout the interview. Agents gave Juliette the opportunity to text his mother, who had arrived at the residence about seven minutes into the interview. *See* Ex. A at 7:15; Tr. at 13. Juliette was also given an opportunity to text or call his girlfriend. Tr. at 41. Juliette declined to directly contact either, but he did ask an agent to let his mother know that "everybody's just talking" and "everything's fine." *Id.* at 13. In declining to contact his girlfriend, Juliette joked about sending her a selfie:

| | |
|---|---|
| Pausic: | [B]efore we leave, or something like that we'll let you make a call to her or you can text her, or whatever you need to do. |
| Juliette: | Wanna take a selfie and send it to her? Like, "Hi guys." |
| Pausic: | [Chuckles] |
| Juliette: | [Chuckles] |
| Isbir: | You want the cuffs back on? [Voices overlap] |
| Juliette: | Yeah. Yeah. That's what … No– [Voices overlap] |

*Id.* at 41

The arrival outside of Juliette's mother was one of a handful of interruptions during the interview. It was also interrupted when, upon Juliette's request to talk to a regulatory expert about his license, that expert came to the interview room to answer questions. *Id.* at 34; 45–48. The

---

[4] Juliette asserts that the interview began with agents telling him "*that they had to take his statement.*" ECF No. 27, at 2 (emphasis in original). This assertion is false.

interview was interrupted again when Juliette's boss called Juliette's cell phone. *Id.* at 53–54. Juliette took the call, holding his own cell phone. Ex. A at 28:22–29:09.

During the interview, Juliette discussed the autoswitches. He admitted to purchasing more than 20 on a phone application. Tr. at 6, 76. He admitted to knowing that they came from China. *Id.* at 37. He admitted to knowing how they functioned, though he said they functioned poorly. *Id.* at 5, 11. And he admitted to installing a device and test firing the modified pistol. *Id.* at 7, 21.

Juliette also discussed two other topics based on contraband found during the search. First, Juliette admitted to possessing other firearms in violation of the NFA. About halfway through the interview, ATF Resident Agent in Charge (RAC) Joe Price entered the interview room and asked if there was anything else agents should know. *Id.* at 57. Juliette responded, "I could tell by your face, you already knew." *Id.* Juliette then proceeded to list unregistered firearms he possessed in violation of the NFA, including a short barrel rifle and an M16 lower receiver that he converted to be fully automatic. *Id.* at 56–57.

Second, Juliette admitted to illegally using anabolic steroids. This admission came only after an agent showed Juliette vials of steroids discovered during the search. *Id.* at 58–59. Juliette explained that he thought he had low testosterone, but his doctor disagreed and refused to write a prescription. *Id.* at 64. So, for around a decade, Juliette purchased and used steroids, which at the time of the interview, he imported China. *Id.* at 61–62. Juliette later showed the agents the application on his phone he used for ordering the steroids. *Id.* at 66.

Because Juliette used his cell phone to import the autoswitches (and steroids), agents informed Juliette that they would have to take the phone to image it. *Id.* at 88. Juliette had not

6

memorized important numbers, and so he scrolled through his contacts calling out those numbers as Agent Pausic transcribed them. *Id.* at 88–90.

At the end of the interview, agents reminded Juliette that he could return to work, but Juliette opted to stay at home as agents concluded the search. *Id.* at 101. The conversation then shifted to small talk about Juliette's job and his girlfriend. *Id.* at 102–05. Then Agent Isbir told Juliette he could not be left alone in the house while the search was concluding, and he offered to stay with Juliette and continue to "bullshit" as the other agents wrapped up. *Id.* at 107. Juliette declined, joking that he did not want to "bore" Agent Isbir. *Id.*; *see also* Ex. A, at 1:04:14–1:04:25.

Before leaving, agents administratively seized Juliette's firearms inventory. The steroids he possessed are controlled substances, and by unlawfully using those controlled substances, Juliette violated both ATF regulations and federal law. In total, ATF seized around 70 firearms, 25 silencers, and ammunition, most of which Juliette possessed under his FFL.

On May 20, 2020, a federal grand jury indicted Juliette for: (1) Unlawful Possession of a Machinegun, 18 U.S.C. § 922(o)(1); (2) Smuggling Goods into the United States, 18 U.S.C. § 545; and (3) Possession of a Firearm and Ammunition by an Unlawful Drug User, 18 U.S.C. § 922(g)(3). ECF No. 1.

On October 9, 2020, Juliette filed a Motion to Suppress Evidence and Statements. ECF No. 27, Def. Mot. to Suppress Evidence and Statements ("Def. Mot."). In his motion, Juliette claims that his interview was a custodial interrogation, and, because he was not Mirandized, his statements should be suppressed. *Id.* at 9. Juliette also moves to suppress evidence allegedly obtained as a result of his statements, including "the alleged steroids and lower receiver." *Id.* Juliette argues that

such evidence is poisonous fruit found as a result of his unwarned statement. *Id.*; *see also id.* at 7–8 (describing the "fruit of the poisonous tree" doctrine).

## II.     LEGAL STANDARD

The Self-Incrimination Clause of Fifth Amendment provides that "[n]o person … shall be compelled in any criminal case to be a witness against himself." U.S. CONST. amend V. In *Miranda v. Arizona*, 384 U.S. 436 (1966), the Supreme Court announced a rule regarding custodial interrogations intended to be a "prophylactic employed to protect against violations of the Self-Incrimination Clause." *United States v. Patane*, 542 U.S. 630, 636 (2004) (plurality opinion). Specifically, in *Miranda*, the Supreme Court "held that certain warnings must be given before a suspect's statement made during custodial interrogation could be admitted into evidence." *Dickerson v. United States*, 530 U.S. 428, 431–32 (2000). Whether a defendant was in custody is an "objective test" involving two discrete inquiries: (1) "what were the circumstances surrounding the interrogation"; and (2) "given those circumstances, would a reasonable person have felt he or she was not at liberty to terminate the interrogation and leave." *Yarborough v. Alvarado*, 541 U.S. 652, 663 (2004) (quoting *Thompson v. Keohane*, 516 U.S. 99, 112 (1995)).

Because *Miranda* is "prophylactic," a law enforcement officer's failure "to give *Miranda* warnings does not, by itself, violate a suspect's constitutional rights." *Patane*, 542 U.S. at 641. As a result, the Self-Incrimination Clause, "is not implicated by the admission into evidence of the physical fruit of a voluntary statement." *Id.* at 636. Thus, physical evidence obtained after a *Miranda* violation is still admissible at trial. *Id.* at 637; *see also United States v. DeSumma*, 272 F.3d 176, 180 (3d Cir. 2001) (holding that "the fruit of the poisonous tree doctrine does not apply to derivative evidence secured as a result of a voluntary statement obtained before *Miranda* warnings are issued").

## III. ARGUMENT

Juliette's interrogation was objectively noncustodial. A reasonable person would have felt free to terminate the interrogation and to leave. As a result, *Miranda* warnings were not necessary, and Juliette's statements should not be suppressed. Even if there had been a *Miranda* violation, there is no factual or legal basis to suppress physical evidence as "fruit of the poisonous tree." The "fruit of the poisonous tree" doctrine does not apply to *Miranda* violations, and, in any event, the physical evidence was discovered during the execution of a valid search warrant based on information independent of Juliette's statements.

### A. **The Interrogation Was Objectively Noncustodial.**

Whether a suspect was in custody is based on the totality of the circumstances. *See Thompson v. Keohane*, 516 U.S. 99, 112 (1995). In *United States v. Willaman*, the Third Circuit listed several factors relevant to the determination of whether a person was in custody during an interrogation:

> (1) whether the officers told the suspect he was under arrest or free to leave; (2) the location or physical surroundings of the interrogation; (3) the length of the interrogation; (4) whether the officers used coercive tactics such as hostile tones of voice, the display of weapons, or physical restraint of the suspect's movement; and (5) whether the suspect voluntarily submitted to questioning.

437 F.3d 354, 359–60 (3d Cir. 2006). In this case, each *Willaman* factor weighs in favor of a finding that the interrogation was noncustodial.

#### 1. Law enforcement told Juliette that he was not under arrest and was free to leave.

The first *Willaman* factor strongly weighs in favor of a finding that the interrogation was noncustodial because agents told Juliette that he was not under arrest and that he was free to leave. At the beginning of the interview, Agent Isbir told Juliette directly: "[Y]ou're not under arrest"

and "[y]ou're free to leave." Tr. at 2. Later in the interview, Juliette was twice reminded that he was not under arrest. *See id.* at 8 ("[S]o you—so again, not under arrest or anything."); *Id.* at 53 ("[S]o you're—like I said, not arrested.").

Juliette's actions during the interview indicated he understood that he was free to leave. At the beginning of the interview he said, "I'm not leaving. … I'll just stay here… [w]ith you guys. I don't, I don't have to be at work." *Id.* at 2. When his boss called, Juliette explained that he had some family issues but that he would "be back down there in a couple of hours." *Id.* at 54. Toward the end of the interview, Juliette was reminded he could return to work, but he decided to stay as agents completed the search. *Id.* at 101, 107.

2. Juliette was interviewed in his home.

The second *Willaman* factor also weighs in favor of a finding that the interrogation was noncustodial because agents interviewed Juliette in his home. "When a person is questioned *on his own turf*, … the surroundings are not indicative of the type of inherently coercive setting that normally accompanies a custodial interrogation." *Willaman*, 437 F.3d at 360 (quoting *United States v. Czichray*, 378 F.3d 822, 826 (8th Cir. 2004)) (emphasis and alterations in original). Thus, courts have often held that an interrogation of a suspect in his home was not custodial. *See, e.g*, *Beckwith v. United States*, 425 U.S. 341, 342, 345–47 (1976) (no custody where IRS agents conducted a cordial interview of a taxpayer at home); *United States v. Faux*, 828 F.3d 130, 138–39 (2d Cir. 2016) (no custody during execution of search warrant by 10 to 15 agents where defendant chose to remain home, was questioned at her kitchen table, was not handcuffed, and was told she was not under arrest).

Juliette's reliance on a non-binding opinion in *United States v. Craighead*, 539 F.3d 1073 (9th Cir. 2008) to argue against this factor is unavailing. *See* Def. Mot. at 9–14. In *Craighead*, a

defendant suspected of trafficking child pornography was home when eight law enforcement officers arrived to execute a search. *Craighead*, 539 F.3d at 1077. The defendant was also interviewed there, in a storage room at the back of the house. *Id.* at 1078.

Although the Ninth Circuit held that the interview was custodial, *Craighead* appears to be an outlier, and is distinguishable from this case. Notably, the Ninth Circuit was troubled by the at-home interview and wondered, "[i]f a reasonable person is interrogated inside his own home and is told he is 'free to leave,' where will he go? The library? The police station?" *Craighead*, 539 F.3d at 1083. Here there is no need to wonder. Juliette could have returned to work—the place from which he came, and the place to which he assured his boss on the phone, during the interview, that he would soon return, Tr. at 54. Or he could have left with his mother when she arrived.

At the same time, the Defendant's arguments based on the four factors listed in *Craighead*, Def. Mot. at 10, are unconvincing. Two of the factors—whether the defendant was restrained at any point and whether he was told he was free to leave, *Craighead*, 539 F.3d at 1086—are addressed elsewhere in this Response.

A third factor is the number of law enforcement personnel who participated in the search. *Id.* at 1084–85. To be sure, more agents participated in the search of Juliette's home than the eight who were at the search in *Craighead*. The number of agents is not dispositive, however, and the convivial nature of the interview as well as Juliette's decision to stay as the search concluded show Juliette had no contemporaneous discomfort with the number of agents.

The final factor is "whether the suspect was isolated from others." *Craighead*, 539 F.3d at 1086–87. While the defendant in *Craighead* may have been isolated, Juliette had abounding access to the outside world. He was given the opportunity to contact his mother and girlfriend. Tr. at 13,

41. He chose not to. And he chose not to despite understanding that he was at liberty to contact them as evidenced by his taking a phone from his boss mid-interview. *Id.* at 53–54. Indeed, rather than talk to his mother, Juliette instructed an agent to tell her "everything's fine." *Id.* at 13. Rather than talk to his girlfriend, he joked about sending a selfie. *Id.* at 41.

Thus, *Craighead* is distinguishable from Juliette's case, and the fact that Juliette's interview took place in his home weighs in favor of a finding that the interview was noncustodial.

3. <u>Juliette's interview lasted approximately one-hour, including interruptions.</u>

The third *Willaman* factor also weighs in favor of a finding that the interrogation was noncustodial because it lasted around one hour. There is no precise time before an interrogation transforms from noncustodial to custodial. The Third Circuit has explained that an interrogation lasting several hours weighed in favor of a finding a defendant was in custody. *United States v. King*, 604 F.3d 125, 138 (3d Cir. 2010). And the Court has also noted that an interrogation lasting ten minutes did not weigh in favor of a finding of custody. *United States v. Killingsworth*, 118 F. App'x 649, 651–52 (3d Cir. 2004).

Although Juliette's interview was at neither extreme, it was marked by interruptions and detours. As noted, Juliette took a phone call from his boss. Tr. at 53–54. He also had a brief discussion with a regulatory expert about the status of his license. *See id.* at 47–48. And the end of the interview included several minutes where Juliette read phone numbers to agents to transcribe them as well as small talk about Juliette's day job and how he met his girlfriend. *See id.* at 87–95. Thus, the length of the interview weighs in favor, albeit less so than other factors, of a finding that the interrogation was noncustodial.

4. Officers remained cordial and respectful throughout the interview.

Contrary to Juliette's motion, the audio of the interrogation and its content make abundantly clear the interview was cordial, not coercive. In fact, the Defendant's key claim regarding the coercive nature of the interrogation—that he was handcuffed—is false. Juliette repeats this falsehood throughout his motion. *See, e.g.*, Def. Mot. at 3 ("he remained handcuffed with his hands behind his back"); *Id.* at 6 ("Mr. Juliette was handcuffed during most or all of the recorded interrogation."); *Id.* at 11 ("The cuffs remained on through some or all of Mr. Juliette's interrogation."); *Id.* at 13 ("Mr. Juliette … remained handcuffed for some or all of his interrogation."). According to the motion, because Juliette was handcuffed, "his situation [was] even more custodial than in" the *Craighead* case discussed above. *Id.*

Juliette was not handcuffed during the interview. At multiple points, Juliette used his hands, unencumbered by handcuffs. He held his cell phone to talk to his boss. *See* Ex. A, at 28:24–29:11 (recording Juliette's conversation with his boss); Tr. at 54. He opened applications on his phone to show agents his orders. *See, e.g.*, *id.* at 50 ("I can go down through the order history to show you, every single one."); *Id.* at 73 ("[D]o you wanna see the [orders] from last year, maybe? … I might as well pull them all up too."). And he scrolled through his phone's contacts to find numbers while Agent Pausic transcribed them. *Id.* at 88.[5]

---

[5] Toward the end of the interview, as agents were preparing to seize Juliette's phone, Agent Isbir asked Juliette if the phone had a passcode. Tr. at 94. If agents had been handling the phone as they questioned Juliette earlier in the interview, the issue of the passcode would have come up then. The same is true for Agent Pausic's questions to Juliette about how to access the application Juliette used to purchase steroids. *See Id.* at 99.

The transcript of the recording confirms Juliette was not handcuffed. Approximately 21 minutes into the interview, when offered the opportunity to text or call his girlfriend before agents took his cell phone, Juliette joked with agents about sending her a selfie:

| | |
|---|---|
| Pausic: | [B]efore we leave, or something like that we'll let you make a call to her or you can text her, or whatever you need to do. |
| Juliette: | Wanna take a selfie and send it to her? Like, "Hi guys." |
| Pausic: | [Chuckles] |
| Juliette: | [Chuckles] |
| Isbir: | You want the cuffs back on? [Voices overlap] |
| Juliette: | Yeah. Yeah. That's what … No– [Voices overlap] |

Tr. at 41; *see also* Ex. A, at 21:22–21:37. Of course, had Juliette been handcuffed, it's unlikely that he would have joked about a selfie, and Agent Isbir's response about putting "cuffs back on" would have been nonsense.

In addition to light-hearted exchanges like about the selfie, the interview had other evidence of cordiality, and in ways contradictory to the Defendant's motion. For example, Juliette states that he "reasonably believed that his livelihood earned from possessing a valid ATF FFL was at risk if he did not accede to the agent's demand that he must give a statement." Def. Mot. 13. But when discussing the issue of Juliette's FFL, Agent Isbir said, "we're not here to mess with the livelihoods but we are here for illegal machine guns." Tr. at 33. Because Isbir lacked expertise on FFL regulations, he offered Juliette an opportunity to discuss his concerns with someone who had expertise. Juliette responded, "I'd like to actually." *Id.* at 34. A few minutes later, Industry Operations Investigator (IOI) Greg Schiller came to answer Juliette's questions. *See id.* at 47–48.

After that exchange, Isbir explained again, "so you're—like I said, not arrested. You haven't been indicted yet, or anything. So, you can continue business as usual as far as I know." *Id.* at 53.

In short, the interrogation was not coercive, and this factor weighs strongly in favor of a finding that the interrogation was noncustodial.

5. <u>Juliette voluntarily submitted to questioning.</u>

As noted, Juliette voluntarily submitted to questioning after being told he could leave at the beginning of the interview. *Id.* at 2. He also stayed after the interview was complete. In case he thought of anything new after the interview ended, Juliette asked the agents for their phone numbers, and volunteered to call them if something came up. *Id.* at 70. Thus, this factor also weighs in favor of a finding that the interrogation was noncustodial.

\*     \*     \*

In sum, each *Willaman* factor weighs in favor of a finding that the interrogation was noncustodial. A reasonable person would have felt at liberty to end the interview. Juliette was told he was not under arrest. The interview took place in his home. He could have returned to work. The interview lasted a little over an hour, including interruptions. The agents were not coercive, and Juliette voluntarily answered questions. Where a person felt at liberty to joke about sending a selfie to his girlfriend, to take a phone call from his boss mid-interview, and to invite a regulatory agent into the room to ask questions, that same person would have felt at liberty to terminate the interrogation and leave. As such, Juliette's motion to suppress his statements should be denied.

B. **The Fruit Of The Poisonous Tree Doctrine Does Not Apply In This Case, And In Any Event, The Evidence Should Not Be Suppressed.**

The Court should not suppress physical evidence as the poisonous fruit of a *Miranda* violation because there was no such violation. Even if the Court found otherwise, the physical

evidence should not be suppressed. The doctrine of the "fruit of the poisonous tree" does not apply to *Miranda* violations, and the physical evidence found during the lawful search was not the result of any statement made by Juliette.

The Defendant's argument that physical evidence should be suppressed as "fruit of the poisonous tree" is based on an incorrect statement of the law. To support his argument, the Defendant cites the Supreme Court's decision in *Segura v. United States*, 468 U.S. 796 (1984). *See* Def. Mot. at 8–9. This citation is problematic for two reasons. First, in *Segura*, the Supreme Court considered the "fruit of the poisonous tree" doctrine in the context of an alleged Fourth Amendment violation—not a *Miranda* violation as alleged by Juliette. *See* 468 U.S. at 797–98 (stating the question presented as: "whether, because of an earlier illegal entry, the Fourth Amendment requires suppression of evidence seized later from a private residence pursuant to a valid search warrant which was issued on information obtained by the police before the entry into the residence"). Second, the Court held that evidence found after a Fourth Amendment violation but pursuant to a valid search warrant based on independent information should not be suppressed under the "fruit of the poisonous tree" doctrine. *Id.* at 799. Juliette does not challenge the validity of the search warrant, and the information supporting the warrant preceded Juliette's interrogation. Thus, even if *Segura* somehow applied to *Miranda*, and even if there was a *Miranda* violation, *Segura* still provides no basis to suppress the evidence.

And any argument about the fruit of the poisonous tree doctrine was foreclosed by *United States v. Patane*, 542 U.S. 630 (2004). In *Patane*, Justice Thomas writing for the plurality explained that "[t]he Self-Incrimination Clause … is not implicated by the admission into evidence of the physical fruit of a voluntary statement." 542 U.S. at 636. Thus, the Court held that a "failure

16

to give a suspect the warnings prescribed by *Miranda*" does not "require[] suppression of the physical fruits of the suspect's unwarned but voluntary statements." *Id.* at 633–34. So, even if this Court found that Juliette was in custody such that *Miranda* was implicated, there is still no legal basis to suppress any physical evidence obtained as a result of those statements.

Not only is there no legal basis to suppress the evidence, but also there is no factual basis on which to suppress it. Juliette withheld admissions about other NFA violations and his steroid use until he was directly confronted by agents who had already found the contraband. In fact, when Juliette was asked about other violations, he responded, "I could tell by your face, you already knew." Tr. at 57.

In sum, there is no basis to suppress the physical evidence in this case.

## IV. CONCLUSION

For the reasons set forth above, the Court should deny the Defendant's Motion.

Respectfully submitted,

SCOTT W. BRADY
United States Attorney

/s/ *Brian M. Czarnecki*
BRIAN M. CZARNECKI
Assistant U.S. Attorney
700 Grant Street, Suite 4000
Pittsburgh, Pennsylvania 15219
brian.czarnecki@usdoj.gov
DC ID No. 1047275